# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WENDY L. SHORE,           )
                              )
       Plaintiff,        )
                              )
       v.                )     Civil Action No. 20-1169-SRF
                              )
KILOLO KIJAKAZI,[1]       )
Acting Commissioner of Social Security,  )
                              )
       Defendant,       )
                              )

## MEMORANDUM OPINION[2]

Plaintiff Wendy L. Shore ("Shore") filed this action pursuant to 42 U.S.C. § 405(g) on April 28, 2016 against the defendant Kilolo Kijakazi, the Acting Commissioner of the Social Security Administration (the "Commissioner"). (D.I. 1) Shore seeks judicial review of the Commissioner's May 23, 2019 final decision denying Shore's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–433. Currently before the court are cross-motions for summary judgment filed by Shore and the Commissioner.[3] (D.I. 17; D.I. 21) For the reasons set forth below, I recommend that the court DENY Shore's motion for summary judgment (D.I. 17), and GRANT the Commissioner's cross-motion for summary judgment (D.I. 21).

---

[1] Kilolo Kijakazi became the Acting Commissioner of Social Security on July 9, 2021. Therefore, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Ms. Kijakazi is substituted as Defendant in place of Andrew Saul.

[2] The parties consented to the jurisdiction of a magistrate judge to conduct all proceedings in this matter through final judgment, and the case was assigned to the undersigned judicial officer on March 25, 2021. (D.I. 15)

[3] The briefing on the pending motions is found at D.I. 18 and D.I. 22. In a notice filed on July 9, 2021, Shore indicated her intention to rest on her opening brief. (D.I. 23)

## I.   BACKGROUND

### A.  Procedural History

Shore protectively filed an application for DIB in April 2016, alleging a disability onset date of December 28, 2014 due to cervical stenosis, cervical radiculopathy, bilateral carpal tunnel syndrome, bilateral rheumatoid arthritis in the upper extremities, and ocular migraines. (D.I. 11 at 237-38, 265)  Shore's claim was denied initially and upon reconsideration.  (*Id.* at 153-56, 162-66)

At Shore's request, an administrative law judge ("ALJ") held a hearing on March 7, 2019.  (*Id.* at 81-116)  The ALJ issued an unfavorable decision on May 23, 2019, finding that Shore was capable of a reduced range of light work and could perform her past relevant work. (*Id.* at 56-68)  The Appeals Council subsequently denied Shore's request for review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner.  (*Id.* at 10-13)

Shore brought this civil action challenging the ALJ's decision on September 2, 2020. (D.I. 1)  Shore filed her pending motion for summary judgment on April 28, 2021 (D.I. 17), and the Commissioner filed a cross-motion for summary judgment on July 1, 2021 (D.I. 21). Briefing is now complete on the pending motions.

### B.  Medical History

The ALJ found that Shore had the following severe impairments: bilateral carpal tunnel syndrome, rheumatoid arthritis, degenerative disc disease of the cervical spine, and obesity. (D.I. 11 at 59)  Shore challenges the ALJ's assessment of certain treating specialists' opinions and her credibility.  (D.I. 18 at 13-23)  The court's consideration of Shore's medical history is focused on evidence relevant to those discrete issues.

### 1. Medical evidence

Shore began experiencing neck and arm pain after being involved in an auto accident in December 2003. (D.I. 11 at 376; D.I. 12 at 46, 62)  At the time, she treated with two neurologists and underwent three months of physical therapy. (D.I. 12 at 62)  She also reduced her work schedule to no more than six hours per shift. (*Id.*; D.I. 11 at 376)  In 2011, she returned to full-time work of eight- to ten-hour shifts. (*Id.*)  Due to her worsening symptoms, however, she sought a leave of absence in December 2014.[4] (D.I. 12 at 63; D.I. 11 at 376)  At her employer's request, she worked several extra days until December 28, 2014. (D.I. 11 at 85-86)

Physical therapy notes from March 2015 indicate that conservative therapy was effective in addressing Shore's neck pain, resulting in increased range of motion and strength in her upper extremities. (D.I. 13 at 171)  On April 7, 2015, Shore underwent a nerve conduction study and electromyography ("EMG") performed by Sandra Maguire, M.D. (D.I. 12 at 332-35)  The results showed only mild abnormalities and no electrophysiological evidence of cervical motor radiculopathy in Shore's upper extremities. (*Id.* at 335)

An MRI of Shore's cervical spine in May 2015 showed a C5-C6 disc protrusion, mild central narrowing, and no significant foraminal narrowing. (D.I. 12 at 39-40, 47, 429)  Shore's primary care physician, James P. Douglas-Steele, M.D., noted diffuse tenderness and weakness in the upper extremities that improved slowly with physical therapy, and he referred Shore for possible spinal injections. (*Id.* at 429-30)  Subsequent trigger point injections administered by Joel S. Golden, M.D., a pain management specialist, provided no relief of her neck and bilateral arm symptoms. (*Id.* at 47, 347, 427-28)  Accordingly, Dr. Douglas-Steele and Dr. Golden

---

[4] The ALJ determined that Shore engaged in substantial gainful activity for the fiscal year 2015 based on her earnings report, which showed earnings of $27,002.01 in 2015. (D.I. 11 at 59, 62, 250)  Shore does not challenge the ALJ's finding on this point.

recommended a cervical epidural steroid injection. (*Id.* at 347, 426)  Shore declined the injection

because she was unable to afford the copay. (*Id.* at 347)

Dr. Douglas-Steele's treatment notes and Shore's physical therapy records from this time

period also describe Shore's hand weakness and diminished fine motor control.  In May 2015,

Dr. Douglas-Steele indicated that Shore's grip and arm strength were improving and suggested

that she continue with physical therapy. (D.I. 12 at 431-32)  In July, he noted diminished grip

strength on the right side but explained that there was "no clear muscle atrophy in the right

hand." (*Id.* at 425)  Shore's physical therapy notes from July to November 2015 confirmed that

Shore had grip / pinch strength of ten pounds on the right side and fifteen on the left. (*Id.* at 190,

254)  Continued physical therapy visits yielded increased range of motion in Shore's cervical

spine and mild improvement in her carpal mobility, although Shore still exhibited limited

endurance with fine motor skills and neck strength. (*Id.* at 238, 241)

By September 2015, Dr. Douglas-Steele described decreased grip strength in both hands

and decreased bilateral upper extremity strength. (*Id.* at 424)  A physical examination in

connection with her EMG that month revealed full strength and intact sensation in the bilateral

upper extremities, and it was noted that Shore exhibited "an unusual constellation of symptoms"

that did not neatly fit a diagnosis of carpal tunnel or cervical myelopathy. (*Id.* at 76)  It was also

determined that Shore's C5-C6 disc protrusion was not likely the cause of her symptoms. (*Id.* at

77)  A brachial plexus MRI performed in October 2015 was "[u]nremarkable . . . without

abnormal signal, enhancement or extrinsic compression lesion," and wrist x-rays taken in

November 2015 revealed normal images of the right wrist and small cystic changes in the left

wrist. (*Id.* at 337, 355)  Shore demonstrated limited progress in improving her hand strength

during the ensuing months of physical therapy, but she did experience improvement in cervical strength and range of motion by November 2015. (*Id.* at 191)

Shore underwent an EMG of her hands and wrists in January 2016 that revealed mild bilateral carpal tunnel syndrome, and night splints were recommended for symptomatic relief. (D.I. 12 at 318)  A May 2016 MRI of Shore's cervical spine showed an "unremarkable study" apart from a small cyst. (D.I. 13 at 101)  In September 2016, Shore visited the emergency room for right arm and elbow pain. (*Id.* at 156)  She was discharged with instructions to take anti-inflammatory steroid medication. (*Id.* at 157)

Shore began treating with neurosurgeon Matthew J. Eppley, M.D., on November 1, 2016. (D.I. 12 at 482-84)  Dr. Eppley observed Shore's trouble with her right-hand function, but his examination revealed no obvious atrophy, no obvious myelopathy, and good grip strength. (*Id.* at 483-84)  He discussed surgical options to address her neck pain but "offer[ed] her no guarantees that surgery will be helpful" because the location of her neck pain was "[u]nproven by EMG." (*Id.* at 484)  Dr. Eppley recommended cervical spine injections, but Plaintiff rejected the recommendation and requested noninvasive treatment options. (*Id.*)

After receiving cervical epidural steroid injections between November 2016 and July 2017, Shore experienced improved range of motion, reduced pain, and 4/5 grip strength in her right hand. (D.I. 12 at 475-79; D.I. 13 at 46-47)  By July 2017, Shore's treatment notes indicate that her pain not only improved after the facet block injections, but also that "[t]he pain has not returned." (D.I. 13 at 47)  Although Shore complained that she continued to experience weakness, numbness, and tingling in her upper extremities, she maintained that she did not wish to pursue surgical options. (D.I. 12 at 485-86)

Shore underwent a bilateral upper extremity EMG on January 2, 2019 that showed normal electrodiagnostic results, with no evidence of carpal tunnel syndrome, nerve entrapment, cervical radiculopathy, or brachial plexopathy. (D.I. 13 at 103)

### 2. Medical opinions

In July 2015, three of Shore's medical providers issued opinions regarding Shore's medical condition, her functional limitations, and her ability to work. (D.I. 13 at 173-75) These opinions, from Dr. Douglas-Steele, Dr. Golden, and Dr. Maguire, confirm that Shore has a disc protrusion in her cervical spine as well as numbness and stiffness in her hands. (*Id.*) Shore's treating physicians summarize the self-reported effects of these conditions, including difficulty holding a pen, writing, operating a computer, opening pill bottles, and sitting or standing without neck support and frequent changes of position. (*Id.*) The opinions indicate that Shore continues her treatment with a physiatrist, but she was instructed not to use a neck brace and she rejected a recommendation for cervical epidural steroid injections. (*Id.*) Two of the three opinions conclude that Shore cannot work as a pharmacist due to her condition. (*Id.*)

On August 4, 2015, physical therapist Jillian Greim opined that Shore could not lift more than five pounds with her right hand, had difficulty reaching and turning objects, could not hold objects for an extended period without dropping them, and could not hold her head up during seated activities. (D.I. 12 at 336) Ms. Greim based these conclusions on observations made during a total of four skilled physical therapy visits. (*Id.*)

Six months later, physical therapist Carina Rodriguez completed a functional capacity evaluation ("FCE") regarding Shore's condition at Dr. Douglas-Steele's request. (D.I. 12 at 106-10) After administering a series of tests, Ms. Rodriguez concluded that Shore was limited to work at the sedentary level for no more than four hours per day, lifting up to ten pounds on an

6

occasional basis. (*Id.*) Ms. Rodriguez identified significant deficits in Shore's range of motion in her cervical spine and bilateral upper extremities, which translated into an inability to perform the repetitive motions necessary to complete tasks in her job as a pharmacist. (*Id.* at 109)

On June 8, 2017, state agency medical consultant Michael H. Borek, D.O. evaluated Shore's records, opining that her condition had not significantly deteriorated, and she would still be capable of performing light work. (D.I. 11 at 143) Dr. Borek acknowledged that Shore had bilateral weakness in her wrists and disc herniation in her cervical spine, but he emphasized her independence in her activities of daily living and her pursuit of conservative treatment rather than surgery. (*Id.*)

Shore's counsel referred her to physical therapist Jeff Vari, who provided a FCE on October 12, 2018. (D.I. 13 at 34-44) Mr. Vari concluded that Shore could work less than two hours per day at a sedentary level of exertion due to significant limitations in her bilateral upper extremities, including a functional grip deficit and a loss of manual dexterity. (*Id.* at 35, 40)

On January 15, 2019, Dr. Eppley evaluated Shore for a review of Mr. Vari's FCE. (D.I. 13 at 176-78) Dr. Eppley concurred with the conclusions in Mr. Vari's evaluation, but he noted Shore's negative EMG results and indicated she continued to decline surgical intervention as a treatment option. (*Id.* at 176-77) His examination confirmed that Shore had full strength in her bilateral upper extremities, some tenderness in her neck, and no difficulties with standing or walking. (*Id.* at 177)

### C.  Hearing Before the ALJ

#### 1.  Shore's Testimony

During the hearing before the ALJ, Shore testified that she had to stop working in December 2014 after 26 years as a pharmacist. (D.I. 11 at 100-01) Shore explained that she lost

7

strength in her hands and began experiencing pain in her neck after an auto accident in 2003, and her condition has worsened since that time. (*Id.* at 88-94)  She described how she experiences constant numbness and pins and needles sensations in her hands, with limited fine motor skills and strength that prevents her from lifting or carrying more than two pounds with each hand. (*Id.* at 92)  Repetitive motions, such as holding her phone or using a computer keyboard, cause her hands to freeze up. (*Id.* at 93)  Holding her head in position without support causes pain in her neck, and she estimated that she could sit or stand without changing position for one hour if her neck was supported, but only for a half hour or forty-five minutes if her neck was unsupported. (*Id.* at 93-95)

In describing how her symptoms have progressed since the auto accident in 2003, Shore indicated that she stopped working in December 2014 because it was too difficult to look at the computer monitor, type on the keyboard, use the phone, or write due to her hand and neck conditions. (D.I. 11 at 100-01)  She estimated that she could no longer perform activities such as gardening by 2015 or 2016. (*Id.* at 88-89)  And she switched from standard plates to paper plates for meals at home in 2018, after she nearly dropped a plate while trying to take it out of the microwave. (*Id.* at 103-04)

With respect to her daily activities and hobbies, Shore testified that she lives with her fiancé, she has a driver's license, and she can drive and run errands independently several times a week. (D.I. 11 at 88-90)  Beyond reading, she explained that there are not any hobbies or activities she can do. (*Id.* at 98-99)  However, she is able to take cruises to the Caribbean biannually, and she travels to visit friends and family in Georgia and Alabama. (*Id.* at 90-91)

### 2.  Vocational Expert Testimony Before the ALJ

At the administrative hearing, the ALJ posed the following hypothetical to vocational

expert ("the VE"):

> Now, if you could please assume a hypothetical individual with the past jobs
> you've described.  The individual has completed at least four years of college.
> The individual during the period issued between the ages of – of 49 and 53 years
> of age.  And the individual has a further level limitation to a light exertional work
> with – with a further limitation to only . . . occasional pushing or pulling with the .
> . . upper extremities or operating hand controls with the upper extremities.  You
> would have to further limitation to only occasional climbing of ladders, ropes, or
> scaffolds.  And then you would be further limited to work that involved only
> occasional crawling.  The individual would be limited to – to work that involved
> only frequent, but not continuous handling or fingering with her bilateral upper
> extremities.  An individual would need to be able to avoid a concentrated
> exposure to work that has a vibration.  Would an individual with these limitations
> be able to do any of the past work that you described as it was done by the
> Claimant or as that work is generally performed in the national economy?

(D.I. 11 at 106-07)  In response to the ALJ's hypothetical, the VE testified that such a

hypothetical individual would be able to perform Shore's past work as a pharmacist, both as it

was actually and generally performed.  (*Id.* at 107)  The ALJ then asked the VE if Shore's past

work would still be available to a hypothetical individual who was further limited to work that

involved lifting or carrying of ten bounds occasionally and less than ten pounds frequently.  (*Id.*)

The VE testified that such a hypothetical individual would not be able to perform Shore's past

work and would be precluded from performing any work at the light exertional level.  (*Id.*)

Next, the ALJ returned to the initial hypothetical and added a further limitation to work

that involved only occasional writing or use of a keyboard.  (D.I. 11 at 107-08)  The VE testified

that Shore's past work as a pharmacist would be precluded because it requires frequent data

entry on a computer.  (*Id.* at 108)  However, the VE suggested that the hypothetical individual

could perform work at the light exertional level in the roles of extrusion operator, subassembler,

and sorter.  (*Id.* at 108-09)  The VE testified that off-task behavior for 10% of the workday

would not preclude work in those positions, but any off-task behavior exceeding that threshold would be work preclusive. (*Id.* at 109-10) At the sedentary exertional level, an individual limited to frequent handling and fingering but only occasional writing or keyboard use would be precluded from working. (*Id.* at 109)

### D.  The ALJ's Findings

Based on the medical evidence in the record and the testimony by Shore and the VE, the ALJ determined that Shore was not disabled under the Act for the relevant time period from the December 28, 2014 disability onset date through the decision date. (D.I. 11 at 56-68) The ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant engaged in substantial gainful activity in fiscal year of 2015 (20 CFR 404.1520(b), 404.1571 *et seq.*).

3. The claimant has the following severe impairments: bilateral carpal tunnel syndrome, rheumatoid arthritis, degenerative disc disease of the cervical spine, and obesity (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except with further limitation to only occasional pushing and/or pulling, including the operation of hand controls with the upper extremities. The claimant is limited to only occasional climbing of ladders, ropes, or scaffolds or crawling. She is also limited to only frequent, but not continuous handling or fingering bilaterally. She should avoid concentrated exposure to vibration.

6. The claimant is capable of performing past relevant work as a Pharmacist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. Although the claimant is capable of performing past relevant work, there are other jobs existing in the national economy that she is also able to perform. Therefore, the Administrative Law Judge makes the following alternative findings for step five of the sequential evaluation process.

8. The claimant has not been under a disability, as defined in the Social Security Act, from December 28, 2014, through the date of this decision (20 CFR 404.1520(f)).

(D.I. 11 at 59-68)

## II.     STANDARD OF REVIEW

Judicial review of the ALJ's decision is limited to determining whether substantial evidence supports the decision. *See* 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "Substantial evidence means enough relevant evidence that 'a reasonable mind might accept as adequate to support a conclusion.'" *Pearson v. Comm'r of Soc. Sec.*, 839 F. App'x 684, 687 (3d Cir. 2020) (quoting *Biestek*, 139 S. Ct. at 1154). When applying the substantial evidence standard, the court "looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek*, 139 S. Ct. at 1154 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The threshold for satisfying the substantial evidence standard is "not high[,]" requiring "more than a mere scintilla" of evidence. *Id.*

## III.    DISCUSSION

### A. Disability Determination Process

Title II of the Social Security Act "provides for the payment of insurance benefits to persons who have contributed to the program and who suffer from a physical or mental disability." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is defined for purposes of DIB as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which

11

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. § 423(d)(1)(A).  A claimant is only disabled if the impairments are so severe that they

preclude a return to previous work or engagement in any other kind of substantial gainful work

existing in the national economy.  *Id.* at § 423(d)(2)(A); *Barnhart v. Thomas*, 540 U.S. 20, 21-22

(2003).

The Commissioner must perform a five-step analysis to determine whether a person is

disabled.  *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel*, 186 F.3d 422, 427-28 (3d Cir. 1999).  If

the Commissioner makes a finding of disability or non-disability at any point in the sequential

process, the Commissioner will not review the claim further.  20 C.F.R. § 404.1520(a)(4).  At

step one, the Commissioner determines whether the claimant is engaged in any substantial

gainful activity.  *See id.* at § 404.1520(a)(4)(i).  If the claimant is not engaged in substantial

gainful activity, step two requires the Commissioner to determine whether the claimant is

suffering from a severe impairment or a severe combination of impairments.  *See id.* at §

404.1520(a)(4)(ii).

If the claimant's impairments are severe, at step three, the Commissioner compares the

claimant's impairments to a list of impairments that are presumed severe enough to preclude any

gainful work.  *See id.* at § 404.1520(a)(4)(iii); *Plummer*, 186 F.3d at 428.  When a claimant's

impairment or its equivalent matches a listed impairment, the claimant is presumed disabled.  *See*

20 C.F.R. § 404.1520(a)(4)(iii).  If a claimant's impairment, either singly or in combination, fails

to meet or medically equal any listing, the analysis continues to steps four and five.  *See id.* at §

404.1520(e).

At step four, the ALJ considers whether the claimant retains the residual functional

capacity ("RFC") to perform past relevant work.  *See id.* at § 404.1520(a)(4)(iv); *Plummer*, 186

F.3d at 428.  A claimant's RFC "measures the most she can do despite her limitations." *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)) (internal quotations and alterations omitted).  The claimant bears the burden of demonstrating the inability to return to past relevant work.  *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude an adjustment to any other available work.  *See* 20 C.F.R. § 404.1520(g); *Plummer*, 186 F.3d at 428.  In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428.  The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she is capable of performing work and is not disabled.  *See id.*  The ALJ often seeks the VE's assistance in making this finding.  *See id.*

### B.  Whether the ALJ's Decision is Supported by Substantial Evidence

Shore challenges the ALJ's decision in two respects: (1) the ALJ failed to properly evaluate the opinions of Shore's treating and evaluating specialists; and (2) the ALJ erred in his assessment of Shore's credibility by failing to consider Shore's work history.  (D.I. 18 at 14-23)

### 1.  Medical opinion evidence

At the time Shore submitted her claim for DIB, the Third Circuit subscribed to the "treating physician doctrine," which requires a treating medical source's opinion to be given controlling or substantial weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." *Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); *Mason v.*

*Shalala,* 994 F.2d 1058, 1067 (3d Cir. 1993); *see also* 20 C.F.R. § 404.1527(c)(2).  In cases where the treating source opinion is either inconsistent with other substantial evidence or not well-supported by objective medical findings, the opinion may be given less than controlling weight, but it should not be automatically rejected.  *See* S.S.R. 96-2p, 1996 WL 374188, at *4 (July 2, 1996); *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008).  Instead, the treating source opinion should be afforded the appropriate amount of deference in accordance with the factors listed in 20 C.F.R. § 404.1527,[5] which include the length of the treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability and consistency of the opinion, and the specialization of the treating physician.  20 C.F.R. § 404.1527(c).  The ALJ need not explicitly discuss each factor under 20 C.F.R. § 404.1527(c), so long as the ALJ's consideration of the evidence is presented clearly enough to allow for judicial review.  *See Samah v. Comm'r of Soc. Sec.*, 2018 WL 6178862, at *5 (D.N.J. Nov. 27, 2018) (quoting *Laverde v. Colvin*, 2015 WL 5559984, at *6 (W.D. Pa. Sept. 21, 2015)).

Although the ALJ may make credibility determinations when the record contains inconsistent or conflicting evidence, the ALJ "cannot reject evidence for no reason or the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066). Accordingly, the ALJ must provide specific reasons for the weight given to the treating source's medical opinion based on the evidence in the record.  S.S.R. 96-2p, 1996 WL 374188, at *5; *see Dass v. Barnhart*, 386 F. Supp. 2d 568, 576 (D. Del. 2005).  Otherwise, the reviewing court cannot judge whether "significant probative evidence was not credited or if it was simply ignored." *Fargnoli*, 247 F.3d at 41; *see Simmonds v. Astrue*, 872 F. Supp. 2d 351, 358 (D. Del.

---

[5] 20 C.F.R. § 404.1527 was superseded by 20 C.F.R. § 404.1520c for claims filed on or after March 27, 2017.  Because Shore's claim was filed prior to this date, 20 C.F.R. § 404.1527 remains in effect.

2012); *Gonzalez*, 537 F. Supp. 2d at 660. Importantly, the ALJ may not reject a treating physician's opinion based on "his or her own credibility judgments, speculation, or lay opinion." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000).

Shore argues that the ALJ did not give appropriate deference or consideration to a number of her treating specialists' opinions under this framework and contends that those opinions support greater limitations than those found by the ALJ in the RFC assessment. (D.I. 18 at 14-18) In particular, Shore challenges the ALJ's evaluation of the opinions of Dr. Douglas-Steele, Dr. Golden, Dr. Maguire, Dr. Eppley, and physical therapists Jillian Greim, Carina Rodriguez, and Jeff Vari.[6] (*Id.* at 14-21)

The ALJ's assessment of the treating source opinions and evaluations is supported by substantial evidence. As a preliminary matter, the opinions of Dr. Douglas-Steele, Dr. Golden, and Jillian Greim from 2015 are inconsistent with the ALJ's unchallenged finding that Shore was engaged in substantial gainful activity in 2015.[7] (D.I. 13 at 173-74; D.I. 12 at 336; D.I. 11 at 59, 62) These opinions describe Shore's limited range of motion and reduced strength in her upper

---

[6] Shore concedes that "the ALJ was not obligated to give any particular consideration to the opinions of Drs. Eskander and Pirestani." (D.I. 18 at 14)

[7] The ALJ raised the issue of Shore's post-onset date earnings during the hearing and requested additional records to establish whether Shore's earnings after her onset date were derived from substantial gainful activity. (D.I. 11 at 87) Based on the earnings evidence of record, the ALJ expressly ruled that "[t]he claimant engaged in substantial gainful activity in fiscal year of 2015." (*Id.* at 59, 62) Shore elected not to challenge the ALJ's step one finding in the briefing on her motion for summary judgment. (D.I. 18) When the Commissioner favorably cited the ALJ's step one ruling in support of the argument that the 2015 opinions were properly given little weight, Shore waived her right to respond. (D.I. 22 at 11-12; D.I. 23) Shore has therefore waived any argument about the ALJ's step one determination of her 2015 earnings. *See Maddaloni v. Comm'r of Soc. Sec.*, 340 F. App'x 800, 801 n.1 (3d Cir. 2009) ("We need not address [the claimant's] contention that the ALJ erred at step four because this issue was not raised before the District Court, and it is therefore waived.").

15

extremities and cervical spine, which translate into an alleged inability to hold a pen, open pill bottles, or use a computer or phone. (D.I. 13 at 173-74; D.I. 12 at 336)

Shore includes Dr. Maguire among the treating specialists opining that Shore is unable to perform her past work as a pharmacist. (D.I. 18 at 14-17) Dr. Maguire had a single appointment with Shore for the purpose of conducting an EMG study on April 7, 2015. (D.I. 12 at 332-35) Without any further follow-up, on July 14, 2015, Dr. Maguire wrote a letter suggesting modifications to Shore's work activities.[8] (D.I. 13 at 175) This occurred in the same month that Dr. Douglas-Steele and Dr. Golden were of the opinion that Shore was totally disabled from working as a pharmacist. (*Id.* at 173-74) Dr. Maguire's opinion is not only contrary to the opinions of the other specialists, but also serves to confirm the ALJ's conclusion that Plaintiff was working as a pharmacist in 2015. Shore fails to address these inconsistencies in her briefing and is silent on their weight and impact on the ALJ's RFC.

Shore's earnings report from this same time period suggests that Shore was engaged in substantial gainful activity, earning more than $27,000 in 2015. (D.I. 11 at 250, 253) Under the regulations, a claimant who is engaged in substantial gainful activity is not disabled. 20 C.F.R. § 404.1520(a)(4)(i). Accordingly, Shore's substantial gainful activity in 2015 supports the ALJ's assignment of little weight to the 2015 opinions of treating specialists concluding that Shore's functional limitations were work-preclusive.

The ALJ's assignment of little weight to the opinions of Dr. Douglas-Steele, Dr. Maguire, and Dr. Golden is also supported by Shore's activities of daily living, objective clinical

---

[8] Dr. Maguire opined that shore "needs to be able to change positions frequently for pain relief. She . . . may need more frequent breaks with work activities to rest her head and neck, as often as 5-10 minutes every hour. . . . She . . . may need assistance with opening pill bottles at work, due to the dexterity and strength required." (D.I. 13 at 175)

findings, and conservative treatment. *See Antoniolo v. Colvin*, 208 F. Supp. 3d 587, 596 (D. Del. 2016) (upholding ALJ's assignment of little weight to treating physician opinions where those opinions were inconsistent with objective medical evidence and conservative treatment). Dr. Douglas-Steele, Dr. Maguire, and Dr. Golden opined that Shore's cervical condition made it difficult for her to hold a pen, write her name, work at a computer, and open pill bottles, among other things. (D.I. 13 at 173-75) But the ALJ noted that these conditions developed as a result of a 2003 auto accident, and Shore was able to perform her work duties for more than ten years following the accident. (D.I. 11 at 62) The ALJ also discussed Shore's ability to drive and go shopping by herself several times per week, as well as her ability to travel internationally on a biannual basis without any reported difficulties. (*Id.*) MRI and EMG results showed only mild conditions that were inconsistent with Shore's self-described symptoms. (*Id.* at 62-63; D.I. 12 at 39-40, 47, 76-77, 318, 337, 355, 429; D.I. 13 at 101, 103) And the record supports the ALJ's conclusion that conservative treatments, such as physical therapy and injections, were reasonably effective in mitigating Shore's symptoms. (D.I. 11 at 63; D.I. 12 at 47, 347, 427-28, 431-32, 475-79, 485-86; D.I. 13 at 46-47, 171) Indeed, Dr. Golden acknowledged in his opinion that Shore rejected cervical epidural steroid injections that were recommended to her. (D.I. 13 at 173)

To the extent that the opinions of Dr. Golden and Dr. Douglas-Steele suggest that Shore is disabled and cannot work as a pharmacist, the ALJ was not obligated to assign any weight to those statements because determinations of disability are reserved for the Commissioner. *See Hoyman v. Colvin*, 606 F. App'x 678, 680-81 (3d Cir. 2015). Shore concedes "it is accurate to state that an ALJ may appropriately ignore opinions that are merely ultimate conclusions about disability." (D.I. 18 at 20) Therefore, Shore agrees that the portions of the opinions of Dr.

17

Douglas-Steele and Dr. Golden expressing a conclusory opinion about Shore's disability are improper conclusions "in part." (*Id.*)

The ALJ's decision to assign little weight to the opinion of Dr. Eppley is also supported by substantial evidence. The ALJ correctly observed that Dr. Eppley had not treated Shore for over a year at the time he gave his opinion. (D.I. 11 at 65) The Third Circuit has recognized that such significant gaps in treatment support an ALJ's determination to assign reduced weight to a treating physician's opinion because they tend to undermine the plaintiff's claims of severity. *See Lee v. Comm'r of Soc. Sec.*, 248 F. App'x 458, 461 (3d Cir. 2007). Also, Dr. Eppley's opinion concurs with Mr. Vari's FCE without further medical findings that support the limitation that Shore can work for less than two hours in an eight-hour workday. (D.I. 13 at 176-78) ("She took another FCE which said she can work less than 2 hours. I agreed with it and signed it."). Dr. Eppley's concurrence with the FCE is inconsistent with his acknowledgement that Shore's "EMG is negative," his request "to check an MRI of her cervical spine" because no recent MRI data was available to him, and his confirmation that she continued to decline surgical intervention or more aggressive treatment options. (*Id.* at 176-77) His physical examination also confirmed that Shore had full strength in her bilateral upper extremities, some tenderness in her neck, and no difficulties with standing or walking. (*Id.* at 177) Consequently, substantial evidence supports the ALJ's decision to assign little weight to Dr. Eppley's wholesale adoption of the limitations set forth in the FCE. *See Peters v. Berryhill*, 2019 WL 2592623, at *4-5 (M.D. Pa. May 28, 2019) (upholding ALJ's assignment of little weight to treating physicians' opinions that concurred with the findings of an FCE which was not supported by clinical findings).

The ALJ was not required to give controlling or substantial weight to the opinions of Dr. Golden, Dr. Maguire, Dr. Douglas-Steele, and Dr. Eppley because those opinions are not well-

18

supported by Shore's MRI and EMG results, they are inconsistent with Shore's work history in the decade following the 2003 auto accident, and they are contradicted by Shore's rejection of more aggressive treatment options. *See Fargnoli v. Massanari*, 247 F.3d 34, 43 (3d Cir. 2001); *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir. 1993); *see also* 20 C.F.R. § 404.1527(c)(2). The ALJ properly assigned little weight to these opinions to account for their inconsistency with the record as a whole. *See* S.S.R. 96-2p, 1996 WL 374188, at *4 (July 2, 1996); *Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 660 (D. Del. 2008).

With respect to the opinions of Ms. Greim, Ms. Rodriguez, and Mr. Vari, the ALJ's assignment of no weight is well-supported because physical therapists were not considered acceptable medical sources for claims filed before March 27, 2017. *See* S.S.R. 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *Hatton v. Comm'r of Soc. Sec. Admin.*, 131 F. App'x 877, 878 (3d Cir. 2005) ("Statements from a physical therapist are entitled to consideration as additional evidence, but are not entitled to controlling weight" because "the rules for evaluating acceptable medical source statements do not apply" to a physical therapist's opinion or FCE). Shore does not dispute this designation. (D.I. 18 at 18) For the reasons previously discussed, these opinions and evaluations are inconsistent with Shore's activities of daily living, objective clinical findings, and pursuit of conservative treatment. Factors weighed in considering evidence from nonacceptable medical sources, such as the length and frequency of the treatment relationship, further support the ALJ's assignment of no weight. *See* S.S.R. 06-03p, 2006 WL 2329939, at *2. The record confirms that Shore had only a consultative relationship with Ms. Rodriguez and Mr. Vari for purposes of obtaining FCEs. (D.I. 12 at 106-10; D.I. 13 at 34-44) Likewise, Shore's treatment with Ms. Greim was limited to a total of four visits over the course of one month at the

time Ms. Greim rendered her opinion.  (D.I. 12 at 336)  Substantial evidence therefore supports the ALJ's decision to assign no weight to the opinions of the physical therapists.

### 2.   Credibility assessment

Shore also contends that the ALJ's credibility assessment of her self-described limitations is defective because the ALJ did not consider Shore's strong work history.  (D.I. 18 at 21-23)  In response, the Commissioner alleges that the ALJ did consider shore's work history and properly rejected Shore's subjective complaints after concluding that they were not supported by the medical evidence.  (D.I. 22 at 14-16)

Here, Shore's subjective complaints are not fully supported by the evidence of record for the reasons previously discussed at § III.B.1, *supra*.  The law is well-established that the ALJ's failure to afford Shore heightened credibility based solely on her work history does not amount to an error requiring remand.  *See Corley v. Barnhart*, 102 F. App'x 752, 755 (3d Cir. 2004) ("[T]he ALJ did not err by failing to afford Corley heightened credibility based solely on his work history.").  An ALJ's failure to explicitly consider a claimant's lengthy record of continuous work is not subject to remand where, as here, the ALJ's credibility determination is based on an explanation of the substantial evidence of record supporting the ALJ's decision.  *See Sanborn v. Comm'r of Soc. Sec.*, 613 F. App'x 171, 177 (3d Cir. 2015) (finding that "the ALJ's credibility determination . . . based on a broad view of the record . . . would have been supported by substantial evidence regardless of whether the ALJ had explicitly considered [the claimant's] employment history.").

20

## IV.    CONCLUSION

For the foregoing reasons, Shore's motion for summary judgment (D.I. 17) is DENIED, and the Commissioner's cross-motion for summary judgment (D.I. 21) is GRANTED.  An Order consistent with this Memorandum Opinion shall issue.


Dated:  March 15, 2022

Sherry R. Fallon
United States Magistrate Judge